United States *v.* Accurate Millinery Co., Roberts, Reilly & Sons, et al. (No. 4838) [1]

United States Court of Customs and Patent Appeals, June 15, 1955

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon* and *Joseph E. Weil*, special attorneys, of counsel), for the United States.

*Brooks & Brooks* (*Thomas J. McKenna* and *J. Joseph McDermott* of counsel) for appellees.

*Isadore Katz, amicus curiae.*

[Oral argument April 7, 1955, by Mr. FitzGibbon, Mr. Katz, and Mr. McKenna]

Before O'Connell, Acting Chief Judge, and Johnson, Worley, Cole and Jackson (retired), Associate Judges

Jackson, Judge, delivered the opinion of the court:

The issue before us concerns the proper classification of imported fur felt hoods which are shapes intended for ultimate use in the manufacture of hats.

The hoods are produced by placing a weighted amount of fur sufficient to make one article in the chamber of an apparatus, from which it is blown into a box-like closed space containing a perforated metal cone, under which there is a suction arrangement in order that air may be drawn through the perforations. As the fur is projected into the box containing the metal cone, which is kept revolving, it settles thereon. During that process hot water is sprayed on the cone. The

[1] C.A.D. 599.

thickness of the layer of fur and its size are governed by controls. The natural scales of the fur fibers interlock by reason of the settling, suction and hot water and, when all of the fur has been deposited, the cone of fur fibers which is very loosely held together and may be easily picked apart, is gently removed from the cone. Subsequently, there is a process of shrinking and compacting the fur so that the fibers may be more closely interlocked. First, the tender fur cone is subjected to a hand-rolling operation, after which it is slightly more compacted than before the rolling. After it has been so rolled, a similar operation is performed in what is known as a "starting" machine. Then it is "crozed" and afterward put into a "multi-roller," which is known as a "fulling" machine.

Exhibits were introduced in evidence to illustrate the condition of the hood at its various stages of manufacture.

It may be noted that, during all of the manufacturing operations subsequent to the original deposit of the fur upon the cone, there is a successive compacting of the material, and at the end of the fulling operation the hoods are of the same structure as those of the importation, but not necessarily possessing the color, lustre, or hardness of the exhibits. Those qualities may be subsequently added to the hood by finishing operations, which include blocking and, if so desired, dyeing.

The Collector of Customs at the Port of New York classified the importation pursuant to the provisions of paragraph 1526 (a) of the Tariff Act of 1930, as modified by the Presidential Proclamation No. 2761 A to be found in T. D. 51802, 82 Treas. Dec. 305, which put into effect the General Agreement on Tariffs and Trade, and the Presidential Proclamation No. 2912 found in T. D. 52600, 85 Treas. Dec. 318, which later proclamation terminated in part the earlier proclamation.

Paragraph 1526 (a), as far as pertinent, provides for:

* * * hoods, for * * * women's * * * wear, trimmed or untrimmed, including bodies, hoods, plateaux, forms, or shapes, for hats * * * composed wholly or in chief value of fur of the rabbit, beaver, or other animals, * * *.

The dutiable rates of that paragraph were on a graduated rising scale, depending upon the value of the hoods per dozen.

The first Presidential Proclamation, hereinbefore mentioned, proclaimed certain modifications of existing duties that had to do, among other things, with hoods, such as set out in the quoted paragraph. That proclamation modified the rates of duty applicable to most of the articles covered by the said paragraph without change in the descriptive language.

As a result of a Tariff Commission investigation, and in accordance with provisions of the said General Agreement, the second proclamation hereinbefore noted was issued by the President terminating, in part, the prior proclamation and withdrawing, in effect, the tariff concessions with respect, among other things, to:

* * * hoods, for women's wear, including bodies, hoods, plateaux, forms or shapes, for women's hats or bonnets, composed wholly or in chief value of fur felt, and valued at more than $9 and not more than $24 per dozen * * *.

The Collector of Customs, in classifying the goods, held that they were "composed wholly or in chief value of fur felt" and accordingly assessed duty thereon at the appropriate rate of the value of the hoods per dozen.

The appellees protested the classification and claimed the merchandise to be "composed wholly or in chief value of fur of the rabbit, beaver or other animals" and not composed in chief value of fur felt. It was further claimed that fur felt had no preexistence at any time before the completed hoods came into being as articles of commerce.

The case was tried before the United States Customs Court, First Division, and judgment entered, pursuant to the court's decision C. D. 1652, 23 Cust. Ct. 191, sustaining the claim made in both the protests, which were filed herein at the appropriate rates under paragraph 1526 (a), as modified by the said General Agreement on Tariffs and Trade, for hoods composed wholly or in chief value of animal fur. From that judgment this appeal was taken.

It will be seen that appellees relied on what is known in customs law as the "preexisting material" doctrine and contended that the clause in the latter of the Presidential Proclamations, "composed wholly or in chief value of fur felt," necessarily presupposes the existence of fur felt before the hoods came into existence. It was argued below by counsel for appellees that the fur felt of the imported goods never had independent existence of the hoods and that, therefore, the goods cannot properly be considered as "composed wholly or in chief value of fur felt" within the meaning of that term, as used in the statute as modified by the latter proclamation.

Counsel for the Government contended below that the Report of the Tariff Commission and the Presidential Proclamation No. 2912 indicate that the Tariff Commission and the President meant "composed wholly or in chief value of fur," when the term "composed wholly or in chief value of fur felt" was used, and that the expression "composed wholly or in chief value of fur felt" did not contemplate a preexistence of fur felt. Government counsel further contended that, if the theory of counsel for appellees were to be held sound, then the weight of the evidence would establish that fur felt was preexistent to the manufacturing of the imported merchandise.

We are in agreement with the reasoning of the trial court, in which it was stated that the contention of counsel for appellant that the term "composed wholly or in chief value of fur felt," as set out in Proclamation No. 2912, should be interpreted as meaning "composed wholly or in chief value of fur" finds no support in the record. The expression contained in the paragraph, as enacted, and also in the

first Presidential Proclamation which modified the same, is "composed wholly or in chief value of fur of the rabbit, beaver, or other animals." In our opinion, it is quite true, as expressed by the lower court, that all hoods composed of fur felt would also be composed of fur, but that not all hoods composed of fur would necessarily be hoods composed of fur felt.

The investigation of the Tariff Commission with respect to hats, etc., including hoods "composed wholly or in chief value of fur felt" was ordered by the Tariff Commission and notice duly given. We think it may be fairly presumed that both the Tariff Commission and the President knew full well that the tariff term appearing in the paragraph and, as modified by the first Proclamation, was "composed wholly or in chief value of fur."

Thus it can be noted that effect must be given to the deliberate choice of the more limited description of hoods composed in chief value of fur felt and those wholly or in chief value of fur.

Furthermore, the notice by the Tariff Commission and its report, together with the Proclamation of the President, clearly limited its investigation to hats, etc., "composed wholly or in chief value of fur felt." Those articles, it appears to us, were properly covered among other products by the language of paragraph 1526 (a). The issue for determination here is the question as to whether or not the hoods are composed wholly or in chief value of fur felt or whether or not in chief value of fur.

It may be noted that, in the forming of the imported goods, the felt had no existence as such until the hoods were completely formed. We do not think tenable the argument made by counsel for appellant that the felt had an existence prior to the process, which terminated in the fulling of the material and brought the hoods into existence.

With respect to the preexistence doctrine, counsel for both litigants cited the case of *Alfred Kohlberg, Inc.* v. *United States*, 27 C. C. P. A. (Customs) 354, C. A. D. 111. In that case, the term "laces * * * and articles wholly or in part thereof" in paragraph 1530 of the Tariff Act of 1930, as applied to certain cotton gloves having lace cuffs, all of which were crocheted in a single process, was up for decision. The trial court there pointed out that the predecessor provision of the involved paragraph was paragraph 1429 of the Tariff Act of 1922 and in that paragraph, the provision was for "articles composed in any part, however small, of lace." The court there was of the opinion that, under the then prevailing decisions, the last quoted provision required the preexistence of lace before the creation of the article of which it was composed in part. *Alfred Kohlberg, Inc.* v. *United States*, 2 Cust. Ct. 84, C. D. 93. The trial court, then noting the change of language, concluded that Congress had intended by the omission of the words "composed * * * of" from the later act to diverge from the line of

decisions relating to the preexisting material doctrine. Consequently, the trial court held that the preexistence of lace was not a requirement under the Act of 1930.

The judgment of the trial court, on appeal, was here affirmed by a divided court and in the decision of the majority, it was stated "At this point it may be noted that we have found no decision of this court in which a provision involving the word 'composed' was held to require the application of the principle of the independent preexistence of a component material." Consequently, this court found it unnecessary to determine the intent of Congress in omitting the words, "composed * * * of," and found that the language used by Congress in the 1930 Act meant that something way be part of the article, even though produced in connection with the making of the article itself.

The minority of the court in that case cited the cases of *United States* v. *Guy B. Barham Co.*, 26 C. C. P. A. (Customs) 83, T. D. 49614, and *Cohn & Lewis* v. *United States*, 25 C. C. P. A. (Customs) 220, T. D. 49335, as authority for their conclusion that any of such terms which included the word, "composed," necessarily implied that the material of which an article is manufactured, made, or composed of should have a prior, separate, and independent existence.

While that case is the latest from this court with respect to the preexisting material doctrine, it should be stated that the tariff term in that case did not contain "composed of," and it was found by the majority not to be implicit in the involved tariff expression.

We agree with the reasoning of the trial court in its holding that the *Kohlberg* case, *supra*, is not a pertinent authority on the question of the preexisting material doctrine.

It appears to us that the doctrine of preexistence discussed in the *Cohn & Lewis* case, *supra*, is rather parallel to what our holding should be here, if not controlling. In that case, the involved merchandise was wool felt hoods classified by the Collector of Customs as manufactured wholly or in part of wool felt. That classification was opposed by the appellants, who claimed that the wool felt had no prior existence as a separate entity and, therefore, the merchandise could not have been manufactured wholly or in part therefrom.

The manufacturing process in that case substantially followed the process through which the involved merchandise was made. There the material consisted of mixed wool and noils. The mixture was first put into a carding machine for combing and cleaning, from which it issued in the form of a wool mattress. Then the material was put into a second carding machine, from which was thrown off a thin veil of wool, which was wound around wooden blocks, and was termed "the carded form of wool." When the web came from the second carding machine, it was evenly laid over a double cone-shaped form, from which, when completed the hat forms were taken by cutting the double cone form in the middle. Subsequent to the second process,

the form went through successive processes. First there was a hardening process, then a shrinking operation, which tightened the fibers. After that, the material was shrunk and tightened by a bumping operation prior to the dyeing process.

This court held in that case that there was no existence of wool felt as an entity prior to the completion of the hat forms and, therefore, such forms were not "wholly or in part of wool felt."

Of course, the statutory language which was in issue in the *Cohn & Lewis* case, *supra*, is different from that of the instant case. Here we have the language "composed wholly or in chief value of fur felt." In the *Cohn & Lewis* case, the language reviewed by us was "manufactured wholly or in part of wool felt."

It seems to us that the language in the two cases must be considered as being interchangeable and, since that is the case, it follows that there must be a preexistence of fur felt here just as preexistence of wool felt was required in the *Cohn & Lewis* case, *supra*.

In that view we believe we are amply sustained by precedents in the *Barham* case, *supra*, where we stated that:

It is well settled that the general rule is that when a tariff statute provides for "an article of specified material, without declaring to what extent it must be composed of that material, it is at least confined to merchandise of which the specified material is that of chief value or is the predominant one therein," and the words "composed of," "made of," and "kindred expressions" in tariff statutes may, according to the context, mean wholly or substantially wholly of a specified material, or wholly or in chief value of such material. *Vantine & Co. v. United States*, 3 Ct. Cust. Appls. 488, T. D. 33124; *Kenyon Co. v. United States*, 4 Ct. Cust. Appls. 344, T. D. 33529; *Blumenthal & Co. et al. v. United States*, 5 Ct. Cust. Appls. 327, T. D. 34529; *Steinhardt & Bro. v. United States*, 8 Ct. Cust. Appls. 372, T. D. 37629; *Simiansky & Co. v. United States*, 9 Ct. Cust. Appls. 288, T. D. 38224; *United States v. Kalter Mercantile Co. et al.*, 11 Ct. Cust. Appls. 540, T. D. 39680; *United States v. Linen Thread Co.*, 13 Ct. Cust. Appls. 359, T. D. 41257.

See also *Curtis & Von Bernuth Mfg. Co. v. United States*, 22 C. C. P. A. (Customs) 651, T. D. 47633; *American Shipping Co., Husney & Co. v. United States*, 22 C. C. P. A. (Customs) 72, T. D. 47064; *United States v. Ascher & Co.*, 11 Ct. Cust Appls. 453, T. D. 39532.

We find no sound reason to discuss the contention of counsel for appellant that the term, "composed of," is a flexible concept. To our way of thinking, it has a clear meaning and quite interchangeable with "made of," "manufactured of," and "manufactured from."

Of course, the imported articles here are fur felt hoods. However, those hoods are articles manufactured of and composed of fur. Since they are manufactured of fur, there can be no question that they cannot be properly considered in any light except that of the preexisting material doctrine. Therefore, we hold that the merchandise herein are fur felt hoods composed wholly or in chief value of fur. The judgment appealed from is *affirmed*.

JACKSON, J., retired, sat in place of GARRETT, C. J.

JOHNSON, Judge, dissenting.

I respectfully dissent from the conclusion reached by the majority.

In order to fully explain the reasons for my dissent, I find it necessary to refer to all of the applicable legislation and the findings of the Tariff Commission relating to certain of the legislation.

However, before proceeding further, I wish to point out that the present controversy relates to the classification of hoods for women's wear which were assessed by the Customs Collector under paragraph 1526 (a) of the Tariff Act of 1930 at 25 per centum ad valorem plus $7.00 per dozen. It was successfully contended by the importer before the Customs Court and before the majority here that the collector's classification was erroneous, and that the proper classification should have been under paragraph 1526 (a) as modified by the General Agreement on Tariffs and Trade, *infra.*

Paragraph 1526 (a) of the Tariff Act of 1930 reads as follows:

Par. 1526 (a) Hats, caps, bonnets, and hoods, for men's, women's, boys', or children's wear, trimmed or untrimmed, including bodies, hoods, plateaux, forms, or shapes, for hats or bonnets, composed wholly or in chief value of *fur* of the rabbit, beaver, or other animals, * * * valued at more than $15 and not more than $18 per dozen, $7 per dozen; * * * and in addition thereto, on all the foregoing, 25 per centum ad valorem. (Italics added.)

Paragraph 1526 (a) of the Tariff Act of 1930 was modified by the General Agreement on Tariffs and Trade, T. D. 51802, as follows:

1526 (a) Hats, caps, bonnets, and hoods, for men's, women's, boys', or children's wear, trimmed or untrimmed, including bodies, hoods, plateaux, forms, or shapes, for hats or bonnets, composed wholly or in chief value of fur of the rabbit, beaver, or other animals:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

Valued at more than $12 and not more than $18 per dozen.    47½% ad val.

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

The concessions granted by the General Agreement remained in effect until the issuance of Presidential Proclamation No. 2912, T. D. 52600, which reads in part as follows:

6. WHEREAS, pursuant to paragraph 13 of Executive Order 10082, dated October 5, 1949 (14 F. R. 6105, 6107), the United States Tariff Commission has made an investigation to determine whether, as a result of unforeseen developments and of the concessions granted in the said trade agreement specified in the first recital of this proclamation with respect to hats, caps, bonnets, and hoods, for *women's wear*, trimmed or untrimmed, including bodies, hoods, plateaux, forms, or shapes, for women's hats or bonnets, composed wholly or in chief value of *fur felt, described in the said item 1526 (a) of Part I of the said Schedule XX,* such products are being imported in such relatively increased quantities and under such conditions as to cause or threaten serious injury to the domestic industry producing like or directly competitive products; (Italics added.)

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

8. WHEREAS the Tariff Commission has made findings of fact and has transmitted to me a report of its findings and has recommended for my consideration in the light of the public interest the withdrawal in whole of the tariff concessions granted in the said General Agreement with respect to hats, caps, bonnets, and hoods, for women's wear, trimmed or untrimmed, including bodies, hoods, plateaux, forms, or shapes, for women's hats or bonnets, composed wholly or in chief value of *fur felt*, and valued at more than $9 and not more than $24 per dozen, *described in the said item 1526 (a) of Part I of the said Schedule XX;* (Italics added.)

\* \* \* \* \* \* \*

Now, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, acting under and by virtue of the authority vested in me by the Constitution and the statutes, including the said section 350 of the Tariff Act of 1930, as amended, do hereby proclaim that the said proclamation of December 16, 1947, is hereby terminated in part to the extent that, on and after December 1, 1950, it shall be applied as though item 1526 (a) in Part I of Schedule XX of the said General Agreement were stated as follows:

| Tariff Act of 1930 (paragraph) | Description of Products | Rate of Duty |
| --- | --- | --- |
| 1526 (a) | Hats, caps, bonnets, and hoods, for men's, women's, boys', or children's wear, trimmed or untrimmed, including bodies, hoods, plateaux, forms, or shapes, for hats or bonnets, composed wholly or in chief value of *fur* of the rabbit, beaver, or other animals (*except any of the foregoing* hats, caps, bonnets, and hoods, for women's wear, including bodies, hoods, plateaux, forms, or shapes, for women's hats or bonnets, composed wholly or in chief value of *fur felt*, and valued at more than $9 and not more than $24 per dozen): \* \* \* (Italics supplied). | |

As can readily be seen from the wording thereof, T. D. 52600, *supra*, was issued as a result of the findings of the Tariff Commission. It is significant to note at this point that the findings of the Tariff Commission were made in a report issued on September 25, 1950— *Report to the President, No. 170, Second Series.* The findings which are pertinent to T. D. 52600 and to the present controversy read as follow:

1. As a result of unforeseen developments and of the effect of the tariff concessions granted thereon by the United States in the General Agreement on Tariffs and Trade, hats, caps, bonnets, and hoods, for women's wear, trimmed or untrimmed, including bodies, hoods, plateaux, forms, or shapes, for women's hats or bonnets, composed wholly or in chief value of *fur felt*, and valued at more than $9 and not more than $24 per dozen, *which products are described in item 1526 (a) of part I of schedule XX (original) of the General Agreement*, are being imported into the United States in such relatively increased quantities and under such

*conditions as to cause serious injury to the domestic industry producing like or directly competitive products, and as to threaten continuance of such serious injury.* (Italics added.)

2. The withdrawal in whole of the tariff concessions granted in said General Agreement on the foregoing products, without specified time limit as to its duration, is necessary to prevent continuance of such injury; and such withdrawal would afford much greater relief to the domestic producers if the effective date of such action were prior to December 1, 1950, than if it were later.

3. Women's fur felt hats and hat bodies valued at not more than $9 per dozen and such products valued at more than $24 per dozen *are not being imported into the United States, as a result of the concessions in the General Agreement on Tariffs and Trade, in such relatively increased quantities and under such conditions as to cause or threaten serious injury to the domestic industry producing like or directly competitive products.*

It appears from the record and briefs that the action of the Tariff Commission in recommending a change in the General Agreement was made after hearings were conducted at the request of interested parties, including labor and management of the domestic *women's* hat industry. The findings resulting from these hearings were submitted to the President in Report No. 170, *supra*.

The Customs Court and the majority here appear to have found that the imported hoods were not composed of "fur felt" but of "fur," and that these hoods should therefore have been assessed under the above cited provision of T. D. 51802. The ultimate reasoning appears to be: that T. D. 52600 excluded from T. D. 51802 hoods made of "fur felt;" that the imported hoods by the application of the *preexisting material doctrine* consisted of "fur" and not of "fur felt;" therefore the General Agreement, T. D. 51802, was still in effect relative to the present importation since T. D. 52600 excluded from the General Agreement women's hoods made of "fur felt" but did not apply to hoods made of "fur."

It is my opinion, upon reviewing the above quoted legislation, that T. D. 52600 modified the General Agreement in a limited sense; that is, among other things, it withdrew the provisions therein relating to *women's* fur or fur felt hoods valued between *$9.00 and $24.00 per dozen.* It seems that this withdrawal was consistent with the findings of the Tariff Commission that the above described items were being imported in such increased quantities under the General Agreement "as to cause serious injury to the domestic industry producing like or directly competitive products."

It is my belief that the terms "fur" and "fur felt" which appear in the above cited legislation are synonymous when viewed both in the light of T. D. 52600 taken by itself, and in the light of previous legislation and the Tariff Commission report. While there is, no doubt, a great difference between "fur" and "fur felt" when the terms are analyzed *in vacuuo*, and to this I readily admit, I believe that the

main question before us is to determine whether or not these terms are synonymous when viewed in the light of their use in T. D. 52600.

My first reason for believing that the terms are synonymous as used is based on the wording of T. D. 52600 itself. An analysis of the first portion of T. D. 52600 shows that it refers to:

"Hats * * * for *women's* wear * * * including hoods * * * composed wholly or in chief value of *fur* of the rabbit, beaver, or other animals" [Italics added.]

The portion of T. D. 52600 in parenthesis, which follows the above quoted portion reads:

(except *any of the foregoing hats*, caps, bonnets, and *hoods* for women's wear * * * composed wholly or in chief value of *fur felt*, and valued *at more than $9 and not more than $24 per dozen*); [Italics added.]

Since the first portion of T. D. 52600 refers to hats of "fur," and the following portion in parenthesis specifically states *"except any of the foregoing * * * composed wholly or in chief value of fur felt, * * *,"* it would appear that the term "fur felt" referred back to the term "fur," and that the two terms were used synonymously. It is correctly stated, I believe, in the brief of the *amici curiae*, "if the phrase 'composed of fur' does not refer to articles 'composed of fur felt,' then it is incomprehensible why the word 'foregoing' should have been used. By the use of the word 'foregoing' in the Proclamation [T. D. 52600], the Executive clearly designated 'hoods composed of fur felt' as being also hoods 'composed of fur.'" Furthermore, it is my opinion that if T. D. 52600 were not interpreted so that "fur" and "fur felt" were synonymous, then there would be no antecedent in the proclamation for the use of the term "fur felt," thus rendering the substance of the proclamation ambiguous and meaningless on its face, and destroying its continuity.

It seems quite clear to me that T. D. 52600 was directly issued as a result of the findings of the Tariff Commission. I therefore believe that T. D. 52600 should be viewed in the light of the Tariff Commission report for the purpose of ascertaining the legislative intent of the former since both the present controversy and T. D. 52600, because of its use of the terms "fur" and "fur felt," indicate that the wording of T. D. 52600 is ambiguous.

It is a cardinal rule of statutory construction that if the language used by the legislative body in the act is so plain and unambiguous as to be readily understood, then there can be no reason or grounds for applying judicial rules of construction to ascertain its meaning. *Procter & Gamble Manufacturing Co.* v. *United States*, 19 C. C. P. A. (Customs) 415. However, I am of the opinion that T. D. 52600 is ambiguous because of the aforementioned discrepancy of language in the use of the terms "fur" and "fur felt." That it is ambiguous is

evidenced by the present controversy as to what its meaning is. Therefore, the master rule of construction, in the consideration of all statutes (and T. D. 52600 has the effect of a statute), is to interpret them as to carry out the legislative intent; if, from a consideration of the statute under consideration, its context, and other statutes in *pari materia* therewith, it appears that a literal interpretation of the statute involved would produce a result contrary to the apparent legislative intent, then the letter of the statute must yield and the legislative intent must be carried out. *Procter & Gamble Mfg. Co.* v. *United States, supra,* and cases cited therein. In the present case I feel that the legislative intent must be ascertained because a literal interpretation of the ambiguous statute, would result in giving it a meaning which would be contrary to the legislative intent.

I believe that it was the legislative intent to use the terms "fur" and "fur felt" synonymously, as stated above. It seems to me that the use of the term "fur felt" in T. D. 52600 was strictly an accidental departure from the previous use of the term "fur" which appeared in the Tariff Act of 1930 and in the General Agreement, *supra*. My reason for this belief is based on the terminology of the Tariff Commission report, *supra*. It will be noted that item 1 of the report refers to paragraph 1526 (a) of the General Agreement and states that:

"* * * hoods * * * for women's hats * * * composed wholly or in chief value of *fur felt* * * * which products are described in item 1526 (a) of Part I of Schedule XX (original) of the General Agreement * * * ." [Italics added.]

A careful examination of paragraph 1526 (a) of the General Agreement discloses that there is no mention made therein of "fur felt," the only reference made therein is to "fur." It therefore appears that the first time the term "fur felt" was used in all of the above quoted legislation was in T. D. 52600 after the Tariff Commission submitted its report to the President. It appears that the terminology "fur felt" was incorporated into T. D. 52600 as a result of the use of this term in the Tariff Commission report. But it is significant to note that the Tariff Commission report erroneously stated that items of "fur felt" were enumerated in the General Agreement, when this term was not used at all. This again indicates to me that the terms "fur" and "fur felt" were used synonymously by the Tariff Commission, and it is my belief that the incorporation of the term "fur felt" into T. D. 52600 was merely an extension of the original error made by the Tariff Commission.

I believe that the foregoing analysis of the Tariff Commission report clearly shows that T. D. 52600 was issued to remedy the shortcomings of the General Agreement, T. D. 51802. The findings of the Tariff Commission in my opinion clarify the ambiguity of T. D. 52600

and show that it was the legislative intent of T. D. 52600 to remove the concession on women's "fur" or "fur felt" hoods valued between $9.00 and $24.00 per dozen from the General Agreement. To hold otherwise, in my opinion, would be to give a literal interpretation to an ambiguous piece of legislation, this interpretation being contrary to the legislative intent.

In addition to the foregoing there are a few other points which I deem necessary to discuss.

I believe that the term "composed of fur felt" which appears in T. D. 52600 is not a limitation pertaining to how the imported hoods were manufactured, but is a term of identification or description which describes what the articles actually are regardless of their manner of fabrication. It is my opinion that this view goes hand in hand with my previous analysis of T. D. 52600 and its legislative history, and with the following analysis of analogous statutes.

The majority here relied on *Cohn & Lewis* v. *United States*, 25 C. C. P. A. (Customs) 220. In that case it was held that the phrase "manufactured wholly or in part of wool felt," which originally appeared in paragraph 1115 (b) of the Tariff Act of 1930, meant that there must be a preexistence of wool felt. The majority in the present case then stated, "It seems to us that the language in the two cases [this case and the *Cohn & Lewis* case] must be considered as being interchangeable and, since that is the case, it follows that there must be a preexistence of fur felt here just as preexistence of wool felt was required in the *Cohn & Lewis* case, *supra.*" I cannot agree with this view. After the decision in the *Cohn & Lewis* case, *supra*, paragraph 1115 (b) was amended by Congress, after hearings, by striking out the word "manufactured." In Report No. 2677 of the House of Representatives, 75th Congress, 3rd Session which accompanied H. R. 8099, which in turn modified the original paragraph 1115 (b) of the Tariff Act of 1930, the following is stated:

\*    \*    \*    \*    \*    \*    \*

Amendment No. 68: Existing law, as established by a recent court decision, provides that hat bodies and similar articles are dutiable under paragraph 1115 (b) of the Tariff Act of 1930 only if made from a material which existed as felt before the bodies and other articles were made. The Senate amendment provides that hat bodies and similar articles shall be dutiable under paragraph 1115 (b), as originally intended by Congress, if they are in chief value of wool felt, regardless of the time when the material became felt. The House recedes.

\*    \*    \*    \*    \*    \*    \*

I believe that if, as held by the majority, the terms "manufactured from" (the term at issue in the *Cohn & Lewis* case) and "composed of" (the term in issue in the present case) mean the same thing, then the subsequent change in statutory language of paragraph 1115 (b) should provide a yardstick for gauging the meaning of the term

"composed of." That is, the preexisting material doctrine should have no application in the present situation because of the parallelism of the subject matter and the wording of the two paragraphs under comparison.

It may be argued, and logically so, that if Congress wanted to change paragraph 1526 (a) to eliminate all doubt as to the applicability of the preexisting material doctrine thereto, it could have done so at the time the wording of paragraph 1115 (b) was changed. However, the fact remains that at the time the change in paragraph 1115 (b) was made, the preexisting material doctrine had not been applied to paragraph 1526 (a) by the courts.

For the foregoing reasons I believe that the judgment appealed from should be *reversed*.